NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 KA 1285

STATE OF LOUISIANA

VERSUS

JEFFERY FLOYD BAHAM

Judgment Rendered: APR 1 2 2022

Appealed from the
Twenty-Second Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Docket Number 1787-F-2021

Honorable Vincent J. Lobello, Judge Presiding

*************

Warren L. Montgomery
Matthew Caplan
J. Bryant Clark, Jr.
Covington, LA

Counsel for Appellant,
State of Louisiana

James Hoeffgen
Covington, LA

Counsel for Defendant/Appellee,
Jeffery Floyd Baham

*************

BEFORE: WHIPPLE, C.J., PENZATO, AND HESTER, JJ.

Penzato, J., concurs

**WHIPPLE, C.J.**

The defendant, Jeffery Floyd Baham, was charged by bill of information with possession of methamphetamine (less than two grams), a violation of LSA-R.S. 40:967(C)(1). The defendant pled not guilty. The defendant filed a motion to quash the bill of information pursuant to LSA-R.S. 14:403.10. Following a hearing on the matter, the trial court granted the motion to quash. The State now appeals, designating one assignment of error. We reverse the trial court's ruling granting the motion to quash and remand.

## FACTS

The following facts were established at the motion-to-quash hearing. On the night of January 25, 2021, based on a 911 call regarding a man slumped over in his truck, St. Tammany Parish Sheriff's Office Deputies Brandon Crain and Ben Sadowski were dispatched to Leon Alley in Folsom. Deputy Crain's body camera recorded the scene. The defendant was alone, sleeping in his truck. After Deputy Crain tapped a couple of times on the rolled-up window, the defendant woke up. Deputies on both sides opened the front truck doors and asked the defendant if he was alright. The defendant appeared groggy and somewhat intoxicated. Firefighters and EMS were dispatched to the scene. The defendant told Deputy Crain he had been working all day and fell asleep. The defendant got out of his truck and sat on his open tailgate while a paramedic, Stephan Silas, examined him. Deputy Crain found a torch lighter and two glass pipes in the truck.[1] According to Deputy Crain, the pipes contained residue.

---

[1] While Deputy Crain's testimony supports the finding of at least two glass pipes, the affidavit of probable cause for arrest prepared by Deputy Crain indicates that three glass pipes were found in defendant's vehicle.

2

Deputy Crain then asked the defendant if he had anything on him. The defendant replied that he had a little "meth" in his pocket, which Deputy Crain retrieved. The defendant was arrested and taken to jail.

**ASSIGNMENT OF ERROR**

In its sole assignment of error, the State argues the trial court erred in granting the motion to quash the bill of information based on LSA-R.S. 14:403.10. Specifically, the State contends the defendant was not in need of medical assistance, did not receive medical assistance for an overdose, and that the trial court erroneously conflated the "overdose" requirement with the "in need of medical assistance" requirement.

When a trial court grants or denies a motion to quash, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion. State v. Welch, 2012-1531 (La. App. 1st Cir. 3/22/13), 115 So. 3d 490, 502. However, a trial court's legal findings are subject to a *de novo* standard of review. State v. Welch, 115 So. 3d at 502.

A motion to quash is, essentially, a mechanism whereby pretrial pleas are urged, i.e., pleas which do not go to the merits of the charge. At a hearing on such a motion, evidence is limited to procedural matters and the question of factual guilt or innocence is not before the court. See LSA-C.Cr.P. art. 531, *et. seq.*; State v. Byrd, 96-2302 (La. 3/13/98), 708 So. 2d 401, 411, cert. denied sub nom, Peltier v. Louisiana, 525 U.S. 876, 119 S. Ct. 179, 142 L. Ed. 2d 146 (1998).

In considering a motion to quash, a court must accept as true the facts contained in the bill of information and in the bill of particulars, and determine as a matter of law and from the face of the pleadings, whether a crime has been charged. While evidence may be adduced, such may not include a defense on the merits. State v. Byrd, 708 So. 2d at 411 (citing State v. Gerstenberger, 260 La. 145, 150, 255 So. 2d 720, 722 (1971); State v. Masino, 214 La. 744, 749, 38 So. 2d

3

622, 623 (1949) ("The fact that defendants may have a good defense is not sufficient grounds to quash the indictment")).

The State argues herein that the trial court misapplied the provisions of LSA-R.S. 14:403.10 and thereby abused its discretion in granting the defendant's motion to quash. Louisiana Revised Statute 14:403.10(B) provides:

> A person who experiences a drug-related overdose and is in need of medical assistance shall not be charged, prosecuted, or penalized for possession of a controlled dangerous substance under the Uniform Controlled Dangerous Substances Law if the evidence for possession of a controlled substance was obtained as a result of the overdose and the need for medical assistance.

In State v. Brooks, 2016-345 (La. App. 5th Cir. 12/28/16), 210 So. 3d 514, 519, and State v. Jago, 2016-346 (La. App. 5th Cir. 12/28/16), 209 So. 3d 1078, 1082, writ denied, 2017-0183 (La. 11/17/17), 228 So. 3d 1218 (per curiam) both decided the same day, the fifth circuit addressed the meaning of overdose in LSA-R.S. 14:403.10(B):

> As written, La. R.S. 14:403.10 B establishes a three-prong test for determining whether the immunity it establishes applies. The person in possession of the controlled dangerous substance must be experiencing an "overdose"; the person must be in need of medical assistance; and the evidence of the controlled dangerous substance must have been obtained as a result of the overdose *and* the need for medical assistance. This statute does not define "overdose," and there is no jurisprudence interpreting this statute.

In determining whether the defendant experienced an overdose, the Jago court stated:

> "Overdose" is defined by the Merriam–Webster Dictionary as "too great a dose (as of a therapeutic agent); *also*: a lethal or toxic amount (as of a drug)." "Toxic," is uniformly defined by the Merriam–Webster Dictionary and by other dictionaries and internet sources as poisonous, deadly, and capable of causing death or serious injury.

State v. Jago, 209 So. 3d at 1082.

The fifth circuit further found in Jago that for the purpose of the immunity provided by LSA-R.S. 14:403.10(B):

> an "overdose" must be of a lethal, toxic, or poisonous amount that is capable of causing death or serious injury, rather than one which is merely dangerous, "too great a dose," or causing a lower level of

4

consciousness. Illegal possession or use of *any* amount of a Controlled Dangerous Substance is, by its nature and by legal prohibition, dangerous and "too great a dose." Therefore, to define "overdose" merely as one which is dangerous or is "too great a dose" would lead to the absurd result of allowing *any* amount of a CDS to satisfy this prong of the test for immunity granted by La. R.S. 14:403.10 B.

State v. Jago, 209 So. 3d at 1083.

In a per curium opinion, the Louisiana Supreme Court denied the writ application seeking review of the fifth circuit's ruling, and rejected the fifth circuit's definition of an overdose being a "lethal, toxic, or poisonous amount that is capable of causing death or serious injury." See State v. Jago, 2016-346 (La. App. 5th Cir. 12/28/16), 209 So. 3d 1078, 1083, writ denied, 2017-0183 (La. 11/17/17), 228 So. 3d 1218 (per curiam). See also State v. Rowe, 2021-0626 (La. App. 1st Cir. 12/30/21), ___ So. 3d___, 2021 WL 6333295, at *5. The Supreme Court, however, did not provide any concrete definition of what constitutes an overdose under LSA-R.S. 14:403.10(B).

Recently, in Rowe, this court affirmed a trial court's determination that an "overdose" is a medical and factual term that requires a witness with a medical background (or a medical expert) to testify as to the medical factors involved in diagnosing whether there has been an overdose. State v. Rowe, ___ So. 3d at ___, 2021 WL 6333295 at *5. We noted that at a trial on the merits, after such a witness testified, the factfinder would need to first accept the testimony of that witness and then determine, under the facts of the case, whether the defendant had experienced a drug-related overdose. State v. Rowe, ___ So. 3d at ___, 2021 WL 6333295 at *5.

At the motion-to-quash hearing herein, defense counsel argued that the defendant was experiencing an overdose and was in need of medical attention. One of the firefighters appeared briefly in St. Tammany Parish Officer Ben Sadowski's body camera video and told the officer the defendant's pupils were

5

pinpoint size, then appeared to say "I think he gonna be an O.D." The firefighter then said, "He's a nod out, look at that ...." The State maintained that the defendant did not overdose, and he was not in need of medical assistance.

In granting the motion to quash, the trial court found in pertinent part:

> On January 25, 2021, St. Tammany Parish Sheriff's Office deputies were dispatched to investigate a person who was slumped over the wheel of his truck near La. Hwy 25 in Folsom. They were dispatched in response to a 911 call reporting a "male subject slumped over in the driver seat" of a vehicle in an alley. The caller reported no further details.
>
> Deputy Brandon Crain and Deputy Ben Sadowski arrived on the scene at around the same time. Deputy Crain was the first to make contact with the defendant, Jeffrey [sic] Baham. Dy. Crain found Mr. Baham asleep in the driver's seat, with the doors and windows shut. Dy. Crain knocked on the window and shone his flashlight on Mr. Baham's face from outside the driver's door in attempt to wake him up. At the same time Dy. Sadowski was knocking on the passenger door window and shining his flashlight on Mr. Baham's face, also attempting to awaken Mr. Baham. After some time, Mr. Baham eventually woke up. Mr. Baham then informed the deputies that he had worked all day and was tired.
>
>    *      *      *      *      *
>
> La. R.S. 14:403.10 is a relatively new statute, having been enacted by the legislature by Acts 2014, No. 392, § 1, effective August 1, 2014.
>
>    *      *      *      *      *
>
> In subparagraph B, immunity is granted to a person who experiences a drug-related overdose when the evidence is found as a result of the overdose and need for medical assistance. In the instant case involving Mr. Baham, the relevant portion of this statute is subparagraph B.
>
> Application of La. R.S. 14:403.10 is problematic because it fails to define two crucial terms contained therein: "drug-related overdose" and "in need of medical assistance". Additionally, because it is a relatively new statute, very little jurisprudence exists to guide courts in its interpretation and application.
>
> It appears there are only two reported cases concerning this statute, both out of the Fifth Circuit Court of Appeal: *State v. Jago*, 209 So.3d 1078 (La. App. 5 Cir. 2016) and *State v. Brooks*, 210 So.3d 514 (La. App. 5 Cir. 2016). In these cases, Mr. Jago and Mr. Brooks were co-defendants in the 29th Judicial District Court for the Parish of St. Charles. Both defendants were charged with La. R.S. 40:964(C) Possession of Heroin.
>
>    *      *      *      *      *
>
> Ultimately, the Fifth Circuit held that Mr. Jago and Mr. Brooks merely showed signs of drug impairment, i.e. slobbering on themselves and unconsciousness, but that there was no evidence of use of a lethal, toxic, or poisonous life threatening amount of drug consumption. *Id.* Therefore, the Fifth Circuit reversed the trial court's granting of Mr. Drago [sic] and Mr. Brooks' motions to quash,

6

reinstated the bill of information, and remanded the matter to the trial court for further proceedings.

Thereafter, Mr. Jago applied for a writ of certiorari with the Louisiana Supreme Court. Interestingly, the Supreme Court, in a per curiam opinion, denied the writ, but found that the Fifth Circuit:

> ... erred in finding that defendant must have injected a lethal quantity of heroin before he can be shielded from prosecution by operation of La. R.S. 14:403.10(B). Requiring a drug user to have experienced a life-threatening overdose--and requiring a lay person before seeking help to determine whether a drug user has experienced a life-threatening overdose--would frustrate the purpose of the [statute], which is to encourage persons to seek help for those they reasonably believe have overdosed. However, under the circumstances here, in which the unconscious defendant was quickly roused and required no medical attention of any kind, La. R.S. 14:403.10(B) does not shield defendant from prosecution because it is only triggered when (emphasis added), "A person ... experiences a drug-related overdose *and is in need of medical assistance...*" Therefore, notwithstanding the court of appeal's erroneous statement of law, the court of appeal reached the correct result and defendant is not entitled to have the charge against him quashed.

                    *         *         *         *         *

Although not clearly stated, the implication of the Supreme Court's decision in *Jago* is that under the facts of that case Mr. Jago did satisfy the first prong of the test. This Court interprets that holding to mean that the rendering unconscious of a defendant due to the excessive consumption of drugs can satisfy the "experiencing a drug-related overdose" prong, such that it triggers La. R.S. 14:403.10(B) immunity. This Court further finds that in this case, Mr. Baham has presented sufficient evidence to show to this Court's satisfaction that the anonymous caller, a lay person, reasonably believed Mr. Baham may have been suffering an overdose and that the caller reasonably believed Mr. Baham may be in need of medical assistance. Mr. Baham was found slumped over the steering wheel in his truck, clearly shown on the video as beyond merely sleeping, but in an obvious state of decreased consciousness. Further, as highlighted by the Supreme Court in *Jago*, this Court's conclusion under the facts of this case is consistent with the legislature's intent and purpose in La. R.S. 14:403.10(B), which was to encourage people, like this caller, to seek help for Mr. Baham when that caller reasonably believed Mr. Baham was suffering an overdose.

Having concluded that the overdose prong La. R.S. 14:403.10(B) is satisfied, this Court must now determine whether Mr. Baham was "in need of medical assistance". In determining this, the Court takes guidance from the Supreme Court's rationale regarding its determination of what qualifies as a "drug-related overdose". That is, this Court is of the opinion that the same standard should be applied, i.e. by examining this question from the perspective of the caller seeking help for Mr. Baham, and whether he reasonably believed Mr. Baham was in need of medical assistance. Under the facts and circumstances of this case, this Court finds that the caller did

7

reasonably believe Mr. Baham was in need of medical assistance. And in fact, his belief turned out to be accurate. Mr. Baham was found to be unconscious in his vehicle. The officer had difficulty awakening him. Moreover, the arresting officer must have reasonably believed Mr. Baham may be in need of medical assistance, because he called for Emergency Medical Services (EMS) from both the fire department and from Acadian Ambulance. Moreover, the EMT from the fire department who arrived on the scene voiced his concern that Mr. Baham was suffering an overdose.

The State argued that Mr. Baham was not in need of medical assistance. However, this argument is contradicted by the testimony during the motion to quash of Stephan Silas, Acadian Ambulance paramedic and Operations Supervisor. Mr. Silas testified that he was dispatched to the scene for an unresponsive male, and that he could not recall how, but he was informed it was "an overdose situation". Mr. Silas testified that Mr. Baham "attempted to refuse treatment". Nevertheless, Mr. Silas then performed a core assessment, consisting of a verbal interview, he checked Mr. Baham's vital signs, checked his blood pressure using an arm cuff, checked his blood sugar using a finger prick, checked his respiration, checked his pulse-oxygen and performed a Glasco coma scale assessment on Mr. Baham.

Mr. Silas testified that he saw no obvious signs of a drug overdose. However, on cross examination, Mr. Silas conceded that drowsiness and elevated blood pressure, both of which he observed during his evaluation of Mr. Baham, could be symptoms of a methamphetamine overdose.[2]

Therefore, whether in this case the Court looks to the reasonableness of the caller's belief that Mr. Baham was in need of medical assistance or whether Mr. Baham was actually in need of medical assistance, this second prong is also satisfied. Mr. Baham was in need of medical assistance, and medical assistance was, in fact, provided.

In reaching this conclusion, this Court notes that the facts in this case are distinguishable from the facts in *Jago*. In *Jago*, it appears that the record was void of any "medical assistance" provided to Mr. Jago or Mr. Brooks by the emergency medical services personnel who arrived on the scene, or at the jail medical facility after they were transported there. On the other hand, as set forth above, in the instant case the paramedic who arrived on the scene conducted what appears to be an extensive field assessment of Mr. Baham. This Court finds that the paramedic's decision to so assess Mr. Baham amply demonstrates that Mr. Baham was "in need of medical assistance". In light of the evaluation, assessment and other tests performed on Mr. Baham by Mr. Silas, the Acadian Ambulance paramedic, to conclude otherwise defies common sense and is not supported by any rule of law of which this Court is aware.

It therefore necessarily follows, that the methamphetamine which the St. Tammany Parish Sheriff's deputies found on Mr. Baham's person, and which forms the basis for his arrest and this charge, was found as a result of a reasonable, good faith belief that Mr. Baham was experiencing a drug-related overdose and Mr. Baham's need for medical assistance. Therefore, the third prong for

---

[2]This statement in the trial court's reasons is not accurate. Silas indicated it was possible that a person could experience drowsiness and elevated blood pressure while *not* overdosing.

the triggering of La. R.S. 14:403.10 is satisfied.

This Court views the legislature's enactment of La. R.S. 14:403.10 as a clear expression of legislative intent and policy that the value of the prospect of preventing an overdose death and preserving human life far outweighs the value of obtaining a conviction for the possession of a controlled dangerous substance. This Court further believes that under the facts and circumstances of Mr. Baham's case, the immunity provided in La. R.S. 14:403.10 was triggered.

The State argues in brief that the trial court conflated an overdose with being in need of medical assistance. The State points out Jago made clear that LSA-R.S. 14:403.10(B) is triggered when a person experiences a drug-related overdose *and* is need of medical assistance. That is, these are two separate requirements. The State contends that the defendant was not in need of medical assistance, particularly in light of Jago. Further, Stephen Silas with Acadian Ambulance did not find the defendant was experiencing an overdose.

The defendant argues the trial court correctly quashed the bill of information and contends that all three prongs under LSA-R.S. 14:403.10(B) were met. The defendant points out that in Jago, the Louisiana Supreme Court found the statute did not apply because Jago required no medical attention of any kind. The defendant further points out, that the fifth circuit in Jago noted that an officer only touched Jago's neck to check for a pulse when he started coming around. The defendant herein suggests that because he was subjected to several medical tests, including an electronic reading of his pulse and a finger prick to measure his blood sugar level, he was shown to require medical treatment. According to the defendant, the State's interpretation of the statute frustrates the purpose of the statute, which is "so that people are not chilled from calling for help" for themselves or others. Also, the defendant contends, the drugs found on him were found as a direct result of his overdose and need for medical assistance.

In the instant case, the defendant was found sleeping in his truck and had to be aroused by the police. There was no clear indication to the deputies on their initial contact with the defendant what was wrong with him. Thus, the prudent

9

response was to call for the assistance of first responders. However, we find no support for the trial court's finding that the "anonymous" 911 caller[3] reasonably believed the defendant may have been suffering an overdose and that she reasonably believed the defendant was in need of medical assistance or the conclusion that such a belief was sufficient to establish the requisite proof of an overdose and need for medical assistance. We further disagree with the trial court's holding that whether a person is in need of medical assistance should be determined by examining the situation from the perspective of the caller. The 911 caller merely informed the operator that a man was slumped over in the back of his truck and after further questioning, stated that she thought the man was in the driver's seat. This was the only information provided by the caller. The brief 911 call does not reflect that the caller thought or believed the defendant was having an overdose or that he needed medical assistance.[4] Instead, the call could have resulted from the caller contemplating a potentially dangerous situation existed, such as being concerned about a man sleeping in his truck in an alley at night or the caller's belief that the defendant was deceased.

Our initial inquiry must begin with whether the defendant was experiencing a drug overdose. While the deputies who arrived at the scene thought the defendant may have needed medical assistance, we find the trial court erred in finding that the defendant was experiencing a drug overdose. Deputy Crain's body camera video showed the defendant was sitting and sleeping in the driver's seat. He was not slumped over. Moreover, the defendant was awakened in a matter of seconds, and he did not show any signs of physical distress. While he sounded somewhat fatigued, he was lucid in his speech. The defendant insisted that he was

---

[3]Moreover, the female caller actually provided her name and phone number.

[4]Due to the timing of the arrival of emergency personnel and the fact that EMS was staged as a precaution, the record is unclear as to the manner in which firefighters and EMS were dispatched.

fine, and he easily communicated with the deputies who questioned him. He informed Deputy Crain that he had been working all day and that he was tired. He also explained that his back was hurting. While his truck was being searched, the defendant sat on his tailgate and smoked a cigarette. When EMS arrived, the defendant sought to refuse treatment. Even after Deputy Crain found the drug paraphernalia in the truck, he determined that the defendant was not experiencing a medical emergency "based on his demeanor and how he was," and concluded he was going to be placed under arrest. Crain indicated that while he drove the defendant to jail, the defendant did not exhibit or experience any type of emergency or stress. At the jail, the defendant was booked and again did not require any treatment.

Stephan Silas testified that he met with the fire department at the scene to be briefed on what had been done up to that point. When Silas examined the defendant, there was nothing obvious or apparent to him to indicate that the defendant required any medical attention. The defendant refused care, and he was not transported to the hospital. Silas did not remember how he got the information that this was an "overdose related situation," but those were the signs he was looking for. Thus, Silas checked the defendant's respiration, pulse oxygen level, and blood sugar. Silas testified, "There was nothing obvious pointing towards an overdose." Silas explained that obvious signs of overdose are "pupil response, sluggishness, lethargicness, altered mental status, unable to answer questions appropriately, unresponsiveness." Silas indicated he did not observe any of these symptoms in the defendant and, importantly, did not treat him under any type of overdose protocol. The record reflects the following exchange between the prosecutor and Silas:

> Q. Okay. So, let's go through what exactly you did as far as patient care on scene?
>
> A. Okay.

11

Q. So, initially when you met with him he tried to refuse care?

A. That's correct. First started off was my assessment. I have a core assessment on there. So, the core assessment is basically interviewing the patient. You start from the head and you go down to the toes looking for any obvious signs. He was able to answer all my questions appropriately. So, a lot of the core assessment was done itself, primarily. So, I checked his vital signs to make sure everything was in normal range and we went from there and in that interview he refused.

Q. Okay. So, during or while you were checking his vital sign, did everything come back normal?

A. That's correct.

Q. Was anything elevated?

A. Nothing elevated.

Q. Was anything too low?

A. Let me rephrase myself. His blood pressure was slightly elevated, but in an emergency setting it was not concerning.

Q. Now, on the core assessment there are some things on your report. So, you have patient's status 4, what does that mean?

A. It is an acuity level. So, the highest priority patient would be a status 1 and then it goes down to status, 2, 3 and 4. Mr. Baham would have fallen under the status 4 criteria for very minimum care.

Q. Okay.

A. If I can add, our status 4, all patient contact regardless if they are having a medical complaint or not we still rate them at a level. So, he falls under the lowest scale.

Q. So, you can have nothing wrong with you and you would rate them a 4?

A. Correct.

Q. As for the dispatch reason, do you recall what your dispatch reason was?

A. Unfortunately, I don't remember that.

Q. If I showed you your report again would you recognize and be able to refresh your memory?

A. I can attempt to.

Q. Okay. If I can point you to on the bottom of your report, does it say dispatch reason?

A. It does give me a dispatch reason.

Q. What is it dispatch?

A. It says unknown problem, man down.

Q. Okay. In your report would I be correct in saying the word overdose does not appear a single time in your report?

A. That's correct.

Q. Okay. Now, at any time when you were interacting with the defendant did you ever suspect that he was in fact overdosing?

A. That was not my suspicion. That was talk and again, I don't remember where I got this information from, but that there might have been drugs, maybe found on his person or found in the vehicle or something along those lines, or it could have been the cause of his unresponsiveness initially, but there was nothing that I saw that pointed in that direction.

Q. Okay. And in your report do you also include a narrative history?

A. That's correct.

Q. Do you recall exactly what you put in the narrative history for this case?

A. Vaguely.

Q. If I showed it to you would you recognize it?

A. Yes.

Q. Do you see the portion of your report that is labeled narrative history?

A. Correct.

Q. In that narrative history is there any mention of overdose?

A. There is no mention of an overdose.

Q. Does it indicate how the defendant was found by the police? Does it make any reference to asleep?

A. Yes. It has, a sixty-six (66) year old male sleeping in his pick-up truck.

Q. Okay. And in that narrative history it also indicates that he refused treatment?

13

A. That's correct.

Q. The only other thing I want to ask you, can you explain what the Glasco Coma Scale score is?

A. The Glasco Coma Scale is a neurological test. It's a quick assessment. If I can reference, you and I would have a Glasco Coma Scale of fifteen (15) which would be the same scale that I gave Mr. Baham that night.

Q. Okay.

A. So, it's basically the highest level you can get in one category is 4. Mr. Baham had that. The next category the highest you can get is a 5. Mr. Baham had that. Then the last category is a 6 is the highest you can get which Mr. Baham had that also, which basically says, you know, you and I are 4, 5 and 6 which is a total score of fifteen. (15)

Q. And on the night that you evaluated Mr. Baham for any concerns he also was a 4, 5, 6 and scored a fifteen (15) on the Glasco Coma Scale?

A. That's correct.

On cross-examination, Silas indicated that it was possible for someone to use methamphetamine and not be overdosing, while still experiencing symptoms like drowsiness and elevated blood pressure.

Based on the foregoing testimonial and video evidence, even assuming the defendant was experiencing a drug-related "high," nothing in the record before us establishes that he was experiencing a drug-related **overdose**. The record does not conclusively establish what caused the defendant's seemingly intoxicated state. When the glass pipes and torch lighter were found in the defendant's truck, the defendant indicated that the pipe found in the driver's visor was his. When Deputy Crain asked the defendant if he had a problem, the defendant said he had a "meth" problem. Deputy Crain then located a plastic bag containing a white glass like material suspected of being crystal Methamphetamine in the defendant's right, front, watch pocket of his pants. However, the defendant was never tested, and he never disclosed what he had consumed or when. The defendant's lethargy could just as well have resulted from consumption of alcohol hours before falling asleep

14

in his truck.[5]

After the defendant was arrested, he made a phone call from jail to an unknown female. When the female asked the defendant what happened, the defendant said: "I fell asleep. Yeah. I mean I didn't get no DWI or anything like that, I just fell asleep." If the defendant had consumed alcohol instead of drugs on the night he was arrested, the prosecutorial immunity of La. R.S. 14:403.10(B) clearly would not apply to him. See State v. Rowe, ___ So. 3d at ___, 2021 WL 6333295 at *5.

In sum, the record does not support a conclusion that the defendant was experiencing a "drug-related overdose" or that he required medical assistance for a drug overdose. Instead, in the instant matter, a witness with a medical background made clear in his testimony that the defendant was not experiencing an overdose. As such, the first prong of LSA-R.S. 14:403.10(B), requiring that the person be experiencing an overdose, was never satisfied. Thus, on the record before us, we find the trial court erred as a matter of law in finding that all three prongs of LSA-R.S. 14:403.10(B) had been met and in concluding that the defendant was thus entitled to the immunity under the statute.

## CONCLUSION

Accordingly, the trial court's ruling granting the motion to quash is reversed, and this matter is remanded to the trial court for further proceedings.

**GRANTING OF MOTION TO QUASH REVERSED; REMANDED.**

---

[5]At the start of the motion-to-quash hearing, the prosecutor informed the trial court the defendant was a fourth-felony habitual offender with various convictions, including a D.W.I., third conviction, and two D.W.I. fourth convictions. The defendant was offered a plea deal to have no habitual offender bill filed against him, which he rejected.

15